UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HITACHI MEDICAL SYSTEMS AMERICA, INC. | ) ) ) | CASE NO. 5:09cv914 |
| Plaintiff, | ) ) | JUDGE JOHN R. ADAMS |
| vs. | ) ) | |
| ADVANCED MEDICAL RESOURCES, INC., et al. | ) ) ) | |
| Defendant. | ) ) | **MEMORANDUM OF OPINION** (Resolving Doc. 67) |

This matter is before the Court on Plaintiff's, Hitachi Medical Systems America, Inc ("Hitachi"), motion for summary judgment. For the reasons that follow, Hitachi's motion (Doc. 67) is GRANTED.

**I.    FACTS**

The underlying facts relevant to the disposition of this matter are as follows. In August of 2004, Hitachi entered into a service maintenance agreement ("SMA") with Defendant, Advanced Medical Resources ("AMR"), for inspection and maintenance of specific medical equipment previously purchased or leased by AMR.  AMR was listed as the purchaser on the SMA and the SMA was executed by Craig Meyer, president of AMR.  Defendants Northland Imaging, LLC ("Northland"), Gulf Coast Open MRI Unit, Ltd. ("Gulf Coast"), Open MRI of Wichita, LLC, ("Wichita"), and Mobile PET of Kansas, LLC ("Mobile PET") were listed, among others, as MRI sites to receive service pursuant to the SMA (collectively "the MRI sites").  Northland, Gulf Coast and Wichita were either parties or third party beneficiaries to the SMA.  AMR is the sole owner of Wichita and Northland and the 99% owner of Gulf Coast.

Pursuant to the SMA, Hitachi would inspect and maintain the specific medical equipment listed in the SMA, located at the above sites, for a period of four years. The SMA remained in effect from August 1, 2004 through July 31, 2008. Relevant to this discussion, the SMA provided for 12 annual preventative maintenance visits. It further covered remedial maintenance required to maintain the equipment at manufacturer's specifications during coverage hours, and that the equipment would provide 98% to 99% uptime during the contract coverage hours. The SMA contemplated a remedy of an additional month of service at the end of the SMA period for each quarter in which the requisite uptime did not occur. The SMA required Defendants to pay the service agreement monthly, in advance. The annual cost to Gulf Coast was $72,500, the annual cost to Northland was $72,500, the annual cost to Wichita was $8,699, and the annual cost to Mobile PET was $105,000.

On April 21, 2009, Hitachi filed it complaint against AMR. On June 3, 2009, Hitachi amended its complaint and added Wichita, Northland, Gulf Coast, and Mobile PET of Kansas, LLC. Mobile PET was later dismissed from the case. Hitachi pled breach of contract, unjust enrichment, and requested a declaratory judgment finding that Defendants are liable to Hitachi for payments required by the SMA and/or services Hitachi provided pursuant to the SMA. Hitachi asserted its compensatory damage amount due to the breach was $370,423.38.

On January 19, 2010, Defendants filed an amended answer and counterclaim against Hitachi. They asserted that Hitachi breached the SMA by failing to provide monthly preventative maintenance, by failing to timely and properly fix equipment problems, by failing to provide the guaranteed 98% uptime, and by failing to maintain the equipment to manufacturer's specifications for the equipment located at Northland, Gulf Coast, and Wichita.

## II. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The non-moving party may not simply rely on its pleadings; rather it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1996). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242248 (1986). Moreover, Fed.R.Civ.P. 56(e)(2)[1] provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

III. **LEGAL ANALYSIS**

*Hitachi's Breach of Contract Claim:*

Initially, Hitachi contends that it is entitled to summary judgment on its breach of contract claim against Defendants. Under Ohio law, Hitachi must demonstrate that (1) a contract

---

[1] Fed.R.Civ.P. 56 was amended effective December 1, 2010. As this matter was pending prior to the amendment, the Court will utilize the version in effect at the time of the filing of the motion. See Fed.R.Civ.P 86.

existed (2) it fulfilled its obligations pursuant to the contract, (3) Defendants failed to fulfill their contractual obligations, and (4) damages resulted from this failure. *Second Calvary Church of God in Christ v. Chomet*, 2008 WL 834434, at *2 (Ohio Ct.App. Mar. 31, 2008); see, also, *Walker v. Rent-A-Center*, No. 5:06CV1232, at *8 (N.D. Ohio Oct. 19, 2007).

*The SMA*[2]

Defendants do not contest that the SMA was a valid contract. Instead, AMR contends that it was not a party to the contract. This assertion is made in spite of the fact that AMR is listed on the contract as the purchaser. AMR contends that through the parties' actions, a novation occurred.

> In Ohio, a contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration. Knowledge and consent to the terms of the novation need not be express, but can be implied from the circumstances or a party's conduct." (Internal citations omitted.)

*Lang v. D&J Homes*, 494 F. Supp.2d 799, 808 (N.D. Ohio 2007).

Specifically, AMR argues that the record evidences the mutual intent of the parties that each MRI site assumed their own individual corresponding payment obligations under the SMA. Therefore, AMR contends it should be dismissed from the lawsuit because the uncontroverted evidence shows it has no liability under the alleged novated SMA. This argument, asserted for the first time in its response to Hitachi's motion for summary judgment, is without merit. To support its argument, AMR points to the SMA itself as evidence that Hitachi was to perform maintenance at each individual MRI site. AMR further points to the fact that at the outset of the SMA, Hitachi individually billed each MRI site and never sent a bill to AMR. It is unclear how

---

[2] Defendants' third count of their counterclaim attempts to assert a breach with regard to a piece of equipment at the Wichita site which is not covered under the SMA attached to the complaint or to the counterclaim. The SMA covering this piece of equipment is the subject of a separate lawsuit. *Hitachi Medical Systems America, Inc. v. Advanced Medical Resources, Inc.,* 5:10cv01011-DDD (N.D. Oh.). As such, any claim with regard to this piece of equipment is dismissed.

this supports an argument that the parties somehow *extinguished* the SMA and instituted a *new* contract. In fact, this argument appears to evidence only that from the execution of the SMA, Hitachi billed the individual MRI sites. It does not provide evidence that Hitachi agreed or impliedly agreed to substitute the individual MRI sites as the purchaser under the SMA. Further, the SMA itself prohibits the assignment by the purchaser, AMR, "in whole or in part to any third party *without the express written consent of [Hitachi]*." It appears that this argument is asserted simply in an effort to extend the life of this case.

To support its opposition, AMR attached the affidavit of its president, Craig Meyer. Meyer avers that AMR was simply "an investment vehicle that invested capital in each of the separate and distinct MRI Center Defendants." However, during discovery, AMR verified that it was the sole owner of Northland and Wichita, and a 99% owner of Gulf Coast. Therefore, regardless of which MRI site's name was on the billing statement or check, in the end, AMR was responsible for payment. Accordingly, AMR has failed to establish a genuine issue of material fact with regard to its contention that it was not a party to the contract.

Next, Defendants put forth significant effort in an attempt to persuade the Court that the acceleration clause as stated in the SMA is an unenforceable penalty provision. The clause at issue states: "Upon the occurrence of any Event of Default, [Hitachi] may, at any time, declare *the unpaid balance for the remaining term* of this SMA to be immediately due and payable." (Emphasis added.) There is no evidence that Hitachi ever utilized the acceleration clause, nor does Hitachi assert any rights pursuant to the acceleration clause. Instead, Hitachi claims that Defendants breached the SMA by failing to pay for services provided. The SMA terminated on July 21, 2008. There is no evidence that Hitachi attempted to accelerate the balance of the SMA during the time period in which the SMA was effective. Instead, Hitachi attempts to collect

payment pursuant to the SMA for services that it provided and that Defendants allegedly failed to pay. The Court declines to address the validity of the acceleration clause as it is not the vehicle Hitachi seeks to use to support its breach of contract claim.

The Court concludes that there are no genuine issues of material fact with regard to the validity of the SMA.

### *Whether Hitachi fulfilled its duty pursuant to the SMA.*

Hitachi contends that it performed all of its duties pursuant to the SMA. In their counterclaim, Defendants assert that Hitachi failed to perform monthly preventative maintenance, failed to timely and properly fix problems with equipment, failed to provide the guaranteed uptime, and failed to maintain the equipment to manufacturer's specifications.

### *"Monthly" maintenance.*

Pursuant to the SMA, Hitachi was to provide preventative maintenance 12 times annually. Defendants assert that pursuant to Hitachi's internal policy and procedures regarding preventative maintenance, documents interpreting how the preventative maintenance was to work pursuant to the SMA and "common logic" confirm that these 12 preventative maintenance visits were to occur monthly. The SMA, however, unambiguously states that the preventative maintenance will occur **12 times a year**. It does not further specify that these visits must be monthly. Further, the SMA states that the SMA "constitutes the entire agreement between the parties relative to the subject matter hereof." Accordingly, Defendants' contention that the preventative maintenance was to be preformed monthly is without merit.

Defendants' counterclaim asserts that Hitachi failed to perform monthly preventative maintenance. Thus, Defendants' argument is based upon the invalid premise that the preventative maintenance was to be preformed monthly. In their interrogatories, Defendants

each specifically stated the months they believed Hitachi failed to provide preventative maintenance. Defendants further explained at various depositions that they determined that these preventative maintenance visits had not been performed because they did not have their own internal records of the visits taking place. Meyer explained that normally when Hitachi technicians performed the maintenance, they left a field service report in a binder that was kept on site with the MRI equipment. The absence of these reports for the months specified, therefore, led Defendants to the conclusion that the visits must not have occurred. Meyer stated at his deposition that he had no personal knowledge as to whether these visits actually occurred and that his testimony regarding Hitachi's failure was based solely on the fact that the field service reports were not left on site. Although Defendants assert that it was Hitachi's internal policy to leave a copy of the field service report on site, they do not point to any evidence to support this assertion. Instead, they cite to the deposition of John Hahn. The page cited, however, is not included as part of the excerpt provided by Defendants. Accordingly, Defendants have failed to establish that Hitachi had an internal policy which required them to leave field service reports on site and that the absence of the reports should lead to the presumption that the maintenance did not occur.

Hitachi, while disputing the basic premise that the preventative maintenance visits were to occur monthly, provided evidence that the preventative maintenance for the months in question had in fact occurred. To this end, Hitachi presented field service reports evidencing coverage for the months in question. In response, Defendants assert that these field services reports are computer generated summaries and are not the original field service reports. Therefore, Defendants argue, Hitachi cannot rely upon this evidence because it is not an original writing pursuant to Fed.R.Evid. 1002. Further, Defendants contend that Hitachi must, pursuant

to Fed.R.Evid 1006, produce upon request the underlying field service reports upon which the summary relies.  In response, Hitachi presents the affidavit of James Confer, Hitachi's Vice President of Service.  Confer avers that "[w]hen [Hitachi] field service technicians perform on-site maintenance, they document the maintenance performed by entering data onto an electronic document management system known as Siebel.  The reports maintained on the Siebel system are known as Field Service Reports. [] [Hitachi] service technicians may also prepare handwritten service reports to leave with the customer."  Further, Confer averred that the Field Service Reports Hitachi "produced in discovery of this case are original documents.  They are not copies of the handwritten reports that [Hitachi] service technicians may leave on-site with a customer, nor are they summaries of reports."  Confer explained that the Field Service Reports "maintained on the Seibel system are the only records of field service performed by [Hitachi] service technicians that [Hitachi] maintains."  Finally, Confer stated that Hitachi "does not maintain copies of the handwritten reports created by [Hitachi] service technicians that may be left with a customer on-site."

In its motion, Hitachi pointed to its service reports presented during Meyer's deposition. It further pointed to Meyer's testimony that he had no personal knowledge of the preventative maintenance not occurring.  In response, Defendants merely attack the validity of the attached service reports.  Hitachi properly rebutted this argument with Confer's affidavit.  Accordingly, the Court concludes that Defendants failed to establish a genuine issue of material fact with regard to this issue.

### *Hitachi's duty to timely and properly fix equipment issues.*

Hitachi asserts that it timely and properly fixed problems as required under the SMA.  In their responses to Hitachi's interrogatories, Northland contends that Hitachi failed to timely fix

an artifact and image quality problem.  Further, Northland identified Barb King as the individual with knowledge of the site problems at Northland.  In its motion for summary judgment, Hitachi points to King's deposition testimony in which she stated that she did not recall artifact and image quality problems at the Northland site.  In response, Defendants point to King's testimony to support their contention that any issues with the machine was prior to her appointment as manager and that she referred Hitachi to the site's technologist and the documentation maintained by the facility.  First, the Court notes that Defendants refer to their own exhibit 12 as if it were King's deposition.  Exhibit 12 before the Court, although entitled the Deposition of Barbara King is actually the deposition of Lance Cain.  Regardless, Hitachi attached King's deposition to its motion.  Upon review, the pages to which Defendants point to support their argument reflect that King stated that the issues with the "monthly" preventative maintenance predated her appointment as manager.  The Court does not read these pages as supporting a conclusion that King did not have personal knowledge of the specific imagine quality problems at the Northland site because it predated her as manager.

     Defendants further point to Meyer's affidavit in which he averred that Northland experienced consistent artifact and image quality problems.  Various field service reports were attached to this affidavit.  The field service reports do indicate that image issues existed with the equipment.  However, the field service reports indicate that Hitachi responded to the problem.  The SMA does not state that Hitachi guaranteed that no problems would arise with the covered equipment.  Rather, it anticipated "remedial maintenance required to maintain the equipment at manufacturer's specifications during coverage hours."  The field service reports do not support a contention that "Northland has produced credible evidence demonstrating [Hitachi's] failure to adequately address and timely fix its repeated artifact and image quality concerns."  Defendants

have not produced any evidence to contradict Hitachi's contention that it performed under the terms of the SMA.  Accordingly, there is no genuine issue of material fact with regard to the Northland site.

Hitachi further contends that it timely and proper fixed equipment problems at the Gulf Coast site.  Defendants contend that Hitachi failed to fix a "signal to noise ratio problem." Hitachi points to Confer's deposition testimony, in which he explained that the problem at the Gulf Coast site was caused by a hurricane.  The hurricane damaged the building which compromised the integrity of the shield room around the magnet.  Defendants point to Meyer's affidavit in which he averred that various Hitachi field service engineers attempted to correct the problem, and "eventually blamed an 'RF' shielding issue.  [Hitachi] contended that its testing showed that the shielding in the MRI room and/or of the equipment itself was compromised allowing a 'radio frequency' to interact with the machine causing the artifact issue."  After Hitachi attempted, but could not fix the problem, Defendants contacted three outside vendors. Meyer averred that "[t]hose outside experts found that [Hitachi's] testing procedures and diagnosis were flawed and that certain other corrections were needed.  Nonetheless, artifact issues continued over certain discrete types of scans (for cervical spine scan) causing Gulf Coast to altogether abandon using that type of protocol."

Defendants do not contest Hitachi's contention that a hurricane caused the issue at Gulf Coast and as a result the shield room around the magnet was compromised.  Defendants do not contest that an "RF" shielding issue was outside the scope of "remedial maintenance" required pursuant to the SMA.  Although Meyer mentions "experts" that reviewed Hitachi's testing procedures and diagnoses, Defendants do not present any evidence from these "experts" that would refute Hitachi's contention that the root of the problem was damage to the MRI suite.

Defendants have failed to establish a genuine issue of material fact as to whether the issue at Gulf Coast was indeed an "RF" shielding issue.

Hitachi next contends that it timely and properly fixed equipment problems at the Wichita site. Defendants contend that Hitachi failed to timely correct freezing and system lock up issues with its ultrasound machine. To the extent that Defendants contend that Hitachi failed to timely address their equipment problems, it is clear from deposition testimony that Hitachi timely responded to Defendants requests regarding these problems. Defendants argue that there is no indication that Hitachi properly and adequately corrected the problem. Specifically, Defendants note that although Meyer testified that Hitachi service engineers responded to notice of the problem, that "he never testified as to those issues ultimately being corrected by [Hitachi]." As stated above, the SMA does not state that Hitachi guaranteed that no problems would arise with the covered equipment. Rather, it anticipated "*remedial maintenance* required to maintain the equipment at manufacturer's specifications during coverage hours." (Emphasis added.) The SMA does not call upon Hitachi to perform *any and all* maintenance necessary to maintain the equipment at manufacturer's specification. If something more than remedial maintenance was required, this was outside the scope of the SMA.

Further, a review of the cited portions of the record reveals that there is no evidence that Hitachi did not properly and adequately address the problem. It is clear that when notified, Hitachi service engineers responded. They fixed the problem to the extent that SMA required. Meyers testified that the problem was ongoing. However, there is nothing in the record to support a contention that this was a continual problem. The problem occurred eight times between September of 2004, during which the problem occurred five times, and February of 2008. Meyers averred that "[s]uch repeated instances of freezing compromised Wichita's ability

to consistently rely on the machine's operation." Again, there is no evidence in the record to support such a conclusion. The record indicates that Wichita continued to use the ultrasound machine, regardless of the eight freezing instances over a period of four years. Even viewing the evidence in the light most favorable to Defendants, it is reasonable to infer that these freezing instances did not affect the use of the machine. Accordingly, there is no genuine issue of material fact with regard to this issue.

*Downtime issues.*

Hitachi contends that Defendants' allegations of excessive downtime does not support their contention that Hitachi did not fulfill its obligations pursuant to the SMA and therefore Defendants were justified in not paying the contract price. The SMA guarantees that the covered equipment will provide 98% uptime during the contract coverage hours. This time is measured over a three month period. For each quarter during which this uptime was not achieved, Hitachi would extend the length of the SMA for one month. This extra time was to be added to the end of the contract period and prior to contract renewal. Hitachi argues that because the remedy for any uptime issues was unambiguously and specifically spelled out in the SMA, it cannot support Defendants' claims for money damages. Defendants do not address this contention in their response. Accordingly, Defendants have failed to establish a genuine issue of material fact with regard to this issue.

It is clear that Hitachi fulfilled its obligations pursuant to the SMA, therefore, Defendants have failed to satisfy their burden to establish a genuine issue of material fact on this issue.

*Whether Defendants failed to fulfill their obligations pursuant to the SMA:*

Hitachi contends that Defendants failed to make their monthly payments pursuant to the terms of the SMA. Notably, Hitachi contends that Defendants are liable for these missed

payments, which include: four monthly payments for Gulf Coast, seven monthly payments for Northland, and 34 monthly payments for Mobile PET.[3]  While Defendants spend much time attempting to justify their failure to make payments pursuant to the SMA, they do not deny that they failed to make the payments.  In fact, they do not address this issue at all.  The record supports Hitachi's contention that Defendants failed to make the monthly payments as stated above.  Accordingly, Defendants have failed to establish a genuine issue of material fact with regard to Hitachi's contention that they failed to make many monthly payments.

Defendants have failed to establish the existence of any genuine issues of material fact, and therefore Hitachi is entitled to judgment as a matter of law on its claims and Defendants' counterclaims.

*Hitachi's damages*

Hitachi asserts that as a result of Defendants' breach, it has been damaged.  Hitachi alleges that it provided services and benefits pursuant to the SMA and was not compensated.  Defendants do not dispute this fact.  As stated above, Hitachi asserts damages for Defendants failure to pay 1) four monthly payments for Gulf Coast, 2) seven monthly payments for Northland, and 3) 34 monthly payments for Mobile PET.  Defendants have failed to establish a genuine issue of material fact with regard to Hitachi's contention that it suffered damages from their breach.

**IV.  Damages**

Although the Court has concluded that Hitachi is entitled to summary judgment, the Court cannot, however, enter final judgment against Defendants because it cannot fully determine damages.

---

[3] Although Mobile PET was dismissed from this action, Hitachi contends that AMR is liable for the breach of the MRI sites.  As explained above, AMR was a party to the SMR and therefore is jointly liable.

Pursuant to the SMA, Gulf Coast and Northland's annual cost were each $72,500.00. Therefore, their monthly payment was $6,041.67. Mobile PET's annual cost was $105,000.00. Therefore, its monthly payment was $8,750.00. Accordingly, Gulf Coast and Northland's total missed payment amount is $66,458.37 ($6,041.67 x 11 missed payments), and Mobile PET's missed payment amount is $297,500 ($8,750.00 x 34 missed payments). Hitachi's compensatory damage amount is approximately $363,958.37. The SMA, however, further contemplates a 1.5% interest rate for past due payments and reasonable attorney fees and costs associated with collecting its fees under the contract. The Court directs Hitachi to file, by January 3, 2011, a request for a sum certain amount due from Defendants under the SMA, setting forth in detail how the sum was reached. Hitachi shall also provide the Court by January 3, 2011 a fee petition along with supporting documentation substantiating the attorney fees and costs incurred in prosecuting this action against Defendants. The Court expects this documentation to include an attorney affidavit, billing statements, and other evidence that will demonstrate both the reasonableness of the hours expended on this litigation and the hourly rate charges.

Hitachi also seeks interest. Ohio Revised Code §1343.03(A) requires the award of prejudgment interest to a successful party on a breach of contract claim as compensation to a creditor for the period of time between the accrual of the claim and judgment. *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 117 (1995). "Once a plaintiff receives judgment on a contract claim, the trial court has no discretion but to award prejudgment interest under R.C. 1343.03(A)." *Knott v. Revolution Software, Inc.*, 181 Ohio App.3d 519, 530 (Ohio Ct.App. 2009) (internal citations omitted). "The only issue for resolution by a trial court with respect to prejudgment interest under R.C. 1343.03(A), is how much interest is due. Thus, the trial court's discretion with respect to an award of prejudgment interest on a contract claim

extends only to the factual determinations of when interest commences to run and what interest rate applied." *Id.* (internal citations omitted.)

As the successful party on a breach of contract claim, Hitachi is also entitled to postjudgment interest under O.R.C. §1343.03(A).  See *State ex rel. Shimola v. City of Cleveland*, 70 Ohio St.3d 110, 112 ("R.C.134.03(A) automatically bestows a right to postjudgment interest as a matter of law.") Hitachi shall, therefore, submit documentation and authority demonstrating when the interest commences to run and the interest rate that is to be applied by 2:00 p.m. on January 3, 2011.  Defendants will have until 2:00 p.m. on January 7, 2011 to respond, if necessary. The Court will conduct a hearing on damages at 9:00 a.m. on January 10, 2011.

**V. Conclusion**

For the above reasons, the Court hereby GRANTS Hitachi's motion for summary judgment against Defendants.  Hitachi will submit, by no later than 2:00 pm on January 3, 2011, proof of its damages, fees, costs, and interest.  Defendants will respond, if necessary, no later than 2:00 p.m. on January 7, 2011.  The Court will conduct a hearing as to the amount of damages at 9:00 a.m. on January 10, 2011.

IT IS SO ORDERED.

December 20, 2010                               */s/ John R. Adams*_____
                                                JUDGE JOHN R. ADAMS
                                                UNITED STATES DISTRICT COURT